518 F.2d 1040
 90 L.R.R.M. (BNA) 2321, 171 U.S.App.D.C. 102,
77 Lab.Cas. P 11,072
 LOCAL NO. 627, INTERNATIONAL UNION OF OPERATING ENGINEERS,
AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
South Prairie Construction Company and Peter Kiewit Sons'
Company, Intervenors.
 No. 73-2277.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 24, 1975.
Decided Sept. 8, 1975.
 
 Laurence Gold, Washington, D. C., for petitioner. J. Albert Woll, Washington, D. C., was on the brief for petitioner.
 Margery Lieber, Atty., N. L. R. B., with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and William H. DuRoss, III, Atty., N. L. R. B., were on the brief for respondent.
 
 
 1
 Edward E. Soule, Oklahoma City, Okl., was on the brief for intervenor South Prairie Construction Co.
 
 
 2
 Robert H. Doyle, Omaha, Neb., entered an appearance for intervenor Peter Kiewit Sons' Co.
 
 
 3
 Before TAMM and LEVENTHAL, Circuit Judges, and MILLER,* Judge, United States Court of Customs and Patent Appeals.
 
 
 4
 Opinion for the Court filed by Judge MILLER.
 
 MILLER, Judge:
 
 5
 Petitioner seeks review of the order of the National Labor Relations Board dismissing a section 8(a)(1) and (5) (29 U.S.C. § 158(a)(1) and (5))[1] complaint issued September 6, 1972, against respondents Peter Kiewit Sons' Co. ("Kiewit") and South Prairie Construction Co. ("South Prairie"). The Board reversed the Administrative Law Judge ("ALJ") and found that Kiewit and South Prairie had no obligation to recognize petitioner, Local 627, as the bargaining representative of the employees of South Prairie or to extend the terms of Local 627's agreement with Kiewit to South Prairie's employees. The key issue is whether, for purposes of the National Labor Relations Act, Kiewit and South Prairie are separate employers, as determined by the Board, or a "single employer," as determined by the ALJ. We vacate the order and remand the case.
 
 
 6
 In deciding the key issue adversely to Local 627, the Board did not point to any of the findings of fact made by the ALJ with which it disagreed. Rather, it appears that the Board's disagreement with the conclusions drawn by the ALJ from these facts as they bear on the "single employer" issue constituted the basis for the Board's reversal.
 
 Background
 
 7
 Respondents are wholly-owned operating subsidiaries of Peter Kiewit Sons', Inc. ("Kiewit, Inc.") All are Nebraska corporations. Kiewit and Kiewit, Inc., have their main offices in Omaha. South Prairie's main office is in Oklahoma City, although the members of its board of directors live in Omaha, have the same set of offices in Omaha as Kiewit, and share with Kiewit the use of Kiewit, Inc.'s telephone switchboard. Kiewit, Inc. performs accounting services for both Kiewit and South Prairie, and paychecks for both Kiewit and South Prairie are made out in Omaha on the same pay machine. Kiewit and South Prairie have separate accounting records, bank accounts, offices in Oklahoma, telephone numbers, supervisors, and office staffs. Neither has subcontracted work to the other. Each submits separate job bids. Each has a different dollar maximum fixed by the Oklahoma State Highway Department for work that it may undertake. Although the Board observed that each has separate officers, the ALJ noted that Kiewit's controller was South Prairie's president until March 1, 1972, that South Prairie's former vice president is Kiewit's executive vice president and a member of its board of directors, and that South Prairie's former secretary is Kiewit's secretary.
 
 
 8
 For many years, Kiewit was engaged in construction work, including heavy and highway construction in Oklahoma. J. N. Darveau was its long-time area manager for Oklahoma and represented it during the negotiations which culminated in the involved agreement with Local 627. This agreement was effective between July 1970 and June 1973 and included union shop and hiring hall provisions. It was at least the third in a series of agreements that had been in effect since 1960 covering heavy and highway construction. Local 627 has represented Kiewit's employees continuously since 1960.
 
 
 9
 Kiewit was the only highway contractor in Oklahoma to have a signed agreement with a union, and its wage costs were higher than those of its competitors.[2] As stated by the Board, because of the disparity in costs from those of its competitors, Kiewit, Inc., decided[3] that South Prairie, a nonunion contractor engaged for many years in heavy and highway construction work outside Oklahoma, should be activated in Oklahoma to compete on equal terms with nonunion contractors.[4] On November 29, 1971, South Prairie filed an application to do business in Oklahoma, receiving its certificate of authority on December 10. In January or February of the following year it submitted a financial statement to the State Highway Department as required of contractors desiring to qualify for the Department's work, and on or about February 25, 1972, it began doing business as a highway contractor.
 
 
 10
 Darveau became South Prairie's president on March 1, 1972, at which time South Prairie took over the Oklahoma City office and an adjacent storage yard which had been occupied by Kiewit when Darveau was its area manager. (Kiewit changed its office to a construction trailer, but had moved to another office at the time of the hearing before the ALJ on October 11 and 12, 1972.) Myron Blume, an engineer estimator for Kiewit, became South Prairie's assistant secretary and assisted Darveau in the preparation of bids as he had while working for Kiewit. The material engineer and the secretary to Darveau while he was with Kiewit became employees of South Prairie in the same capacities, as did the superintendent in charge of the storage yard. By the time of the hearing before the ALJ, a majority of South Prairie's supervisory staff had been supervisors for Kiewit. Most of this group transferred without any break in employment; and normally they continued to serve in the same capacity, to receive the same salaries, and to be covered by the same insurance plan. There was no hiring by Kiewit of supervisors who had worked for South Prairie.
 
 
 11
 The ALJ pointed to an instance when a Kiewit employee performed work for South Prairie but was paid by Kiewit. In June 1972, Gerald Kitchin, the truck mechanic foreman for Kiewit at "the Will Rogers Airport job," asked mechanic Kenneth Bolding, also employed by Kiewit at that job, about working in South Prairie's Oklahoma City yard. Bolding replied that he did not want to go because he would lose his health and welfare benefits, "that being a non-union company." A few days later, Kitchin told Bolding that "we have it worked out to where you will go ahead and be paid through this office at the airport." Bolding then reported to South Prairie's Oklahoma City yard where he worked for a month constructing a "steel inserter" with the assistance of South Prairie's equipment supervisor and a South Prairie mechanic. While working on this equipment, Bolding was paid at his old union rate by Kiewit checks. As a result of this activity, about $5,000 (representing labor and material) was transferred from Kiewit to South Prairie's account.[5]
 
 
 12
 The ALJ described another incident. When Kiewit had no more need for a "batch plant" crew at "the Nowata job," the concrete foreman told the crew to go to South Prairie's Tulsa paving job. Three members of the crew drove directly to the Tulsa paving job and began work at about the same rate of pay, without applying therefor and without any break in employment.
 
 
 13
 Between January 1 and November 23, 1971, the date South Prairie filed to do business in Oklahoma, Kiewit bid on thirty-five Oklahoma State Highway Department jobs and was low on four, the last of which was obtained on November 23.[6] Between February 25 and June 23, 1972, South Prairie bid on four State Highway Department jobs (representing five to ten percent of the work offered by the Department), and on June 20, 1972, it bid on four of the five jobs let by the Oklahoma Turnpike Authority. None of these bids was successful. Between November 23, 1971, and July 23, 1972, Kiewit submitted no bids for State Highway Department jobs.[7] Between July 23 and October 1, 1972, Kiewit bid on three Highway Department jobs, but received none. During the same period, South Prairie bid on three different Highway Department jobs and received one, which the ALJ termed "one of the largest in Highway Department history." At the time of the hearing on October 11 and 12, 1972, South Prairie had not yet begun work on this job (which the ALJ found could be performed by Kiewit), but during the time it had been in business in Oklahoma it had performed work on several Oklahoma jobs as a subcontractor.
 
 
 14
 Commencing in March 1972, Local 627's business agent, Ellis, complained to Kiewit's Coyne and South Prairie's Darveau that Kiewit had brought South Prairie into Oklahoma to start bidding on highway work. Coyne disclaimed knowledge "of any part of it," although he had actually participated in the decision of Kiewit, Inc.'s board of directors to bring South Prairie into Oklahoma. Ellis sought unsuccessfully to have Kiewit and South Prairie agree to apply the Union's agreement with Kiewit to South Prairie's work. On June 20, 1972, the day South Prairie bid on four Turnpike Authority jobs, Local 627 filed the charge that led to the proceedings below.
 
 Guidelines for "Single Employer" Status
 
 15
 In Radio Union v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965), the Supreme Court, in a per curiam opinion affirming a "single employer" holding below, said:
 
 
 16
 The controlling criteria, set out and elaborated in Board decisions, are interrelation of operations, common management, centralized control of labor relations and common ownership.
 
 
 17
 The Court cited several NLRB decisions including one affirmed in Sakrete of Northern California, Inc. v. NLRB, 332 F.2d 902 (9th Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965). In Sakrete, the Ninth Circuit stated, at 907:
 
 
 18
 even if the substantial evidence shows interrelationship of operations, centralized control of labor relations, or common management only at the executive or top level, we do not agree that this precludes application of the "single employer" concept.
 
 
 19
 It pointed out that these three criteria "deal not with power and authority, as such, but with its exercise," and that such criteria, "on any level, are considerations in addition to the factor of common ownership or financial control."[8]
 
 
 20
 Although the Supreme Court in Radio Union, supra, commented that the record in that case was more than adequate to show that all of the four "controlling criteria" were present, it does not appear that all four criteria must be present. In one of the NLRB cases cited, Canton, Carp's, Inc., 125 N.L.R.B. 483 (1959), the Board observed that it had on several occasions made a finding of a single employer status in the absence of a common labor relations policy, and even when it had been affirmatively shown that each of two corporations held to be a single employer established its own labor relations policy. In another of the NLRB cases cited, V.I.P. Radio, Inc., 128 N.L.R.B. 113 (1960), the Board found that there was little or no employee interchange; but 90 percent stock ownership of the second corporation, the same officers and directors, and centralized control of "general labor policy" and operations resulted in a "single employer" holding. In still another cited NLRB case, Overton Markets, Inc., 142 N.L.R.B. 615 (1963), the Board noted, at 619, that the circumstances were not "characteristic of the arm's length relationship found among unintegrated companies."[9] Its conclusion that there was a "single employer" for purposes of the Act rested on consideration of "all the circumstances" of the case.
 
 
 21
 From the foregoing, we conclude that "single employer" status, for purposes of the National Labor Relations Act, depends upon all the circumstances of the case, that not all of the "controlling criteria" specified by the Supreme Court need be present; that, in addition to the criterion of common ownership or financial control, the other criteria, whether or not they are present at the top level of management, are "controlling" indicia of the actual exercise of the power of common ownership or financial control; and that the standard for evaluating such exercise of power is whether, as a matter of substance, there is the "arm's length relationship found among unintegrated companies."[10]
 
 Centralized Control of Labor Relations
 
 22
 In its opinion, the Board stated that a "critical factor" in determining the "single employer" issue is the degree of common control of labor relations policies. Petitioner argues that such control follows from the fact that the parent company, Kiewit, Inc., and its wholly owned subsidiary, Kiewit, decided that South Prairie would operate on a nonunion basis in Oklahoma. On the other hand, respondent NLRB's position is that this does not follow, because, "within that framework" (i. e. operating nonunion), South Prairie's labor policy determinations are set by South Prairie's president; whereas Kiewit's labor policies are determined by an official of Kiewit, Inc.
 
 
 23
 Although, as pointed out above, centralized control of labor relations is one of the "controlling criteria," it is not "critical" in the sense of being the sine qua non of "single employer" status. Canton, Carp's, Inc., supra. The degree to which such control is present (or absent) is, of course, one of the circumstances upon which "single employer" status depends. The Board did not say that there was no degree or no substantial degree of centralized control of labor relations, although this might be implied from its comment about labor policy determinations being set by South Prairie's president within the "framework" of a nonunion policy. In any event, exercise of control by the decision imposing such a "framework" on South Prairie's Oklahoma operations constitutes a very substantial qualitative degree of centralized control of labor relations. It is the touchstone for day-to-day decisions by South Prairie's president respecting wages, hours, health and welfare benefits, working conditions, and other vital matters that otherwise would be decided by collective bargaining.[11] Moreover, we are satisfied that such exercise of control at the top level of management would not be found in the arm's length relationship existing among unintegrated companies.
 
 The "Single Employer" Issue
 
 24
 The presence of a very substantial qualitative degree of centralized control of labor relations does not, however, determine the key "Single Employer" issue. As we have pointed out above, all the circumstances of the case must be considered. In its opinion, the Board stated that it had considered the record and the ALJ's decision, which might imply that it had considered all the circumstances of the case in accordance with the standard recited in Overton Markets, supra. The Board recognized that Kiewit and South Prairie are wholly owned subsidiaries of Kiewit, Inc., and are engaged in related businesses. It did not refer to the criteria of interrelation of operations and common management,[12] although it commented that Kiewit and South Prairie have different officers, separate accounting records, bank accounts, offices in Oklahoma, telephone numbers, supervisors, and office staffs; also, that neither has subcontracted work to the other, and that each submits separate job bids (as required by Oklahoma law). Without more, such facts might tend to indicate an absence of interrelation of operations or common management. However, as related above, the record discloses much more: the same set of offices in Omaha for the boards of directors of the two companies; the interchange of key personnel[13] between the two companies (Kiewit's Oklahoma area manager, Darveau, who either decided or recommended that South Prairie be activated in Oklahoma, to South Prairie as president; South Prairie's president to Kiewit as controller; South Prairie's vice president to Kiewit as executive vice president and member of its board of directors; South Prairie's secretary to Kiewit as secretary; Darveau's engineer estimator at Kiewit to South Prairie as assistant secretary to continue assisting Darveau in the preparation of bids; the material engineer and the secretary to Darveau at Kiewit to South Prairie in the same capacities; the storage yard superintendent at Kiewit to South Prairie in the same position; and transfers of supervisors from Kiewit to South Prairie to the extent that a majority of the latter's supervisory staff was composed of such transferees); the payment of compensation by Kiewit to a mechanic who worked for South Prairie in South Prairie's Oklahoma City yard; the circumstances of the shift of the batch plant crew from Kiewit's Nowata job to South Prairie's Tulsa paving job; and the takeover by South Prairie of Kiewit's Oklahoma City office and storage yard when Darveau became South Prairie's president. These facts and circumstances were not even commented upon by the Board,[14] and they evidence a substantial qualitative degree of interrelation of operations and common management one that we are satisfied would not be found in the arm's length relationship existing among unintegrated companies.
 
 
 25
 In view of the foregoing and considering all the circumstances of this case, we hold that the Board's finding that respondents Kiewit and South Prairie are separate employers for purposes of the National Labor Relations Act is not warranted by the record. See NLRB v. Hearst Publications, Inc., 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944).
 
 Section 8(a)(1) and (5) Issue
 
 26
 The Board premised its determination of this issue on its erroneous finding that Kiewit and South Prairie are separate employers. However, in the course of its opinion, it declared:
 
 
 27
 It is not uncommon in the construction industry for the same interests to have two separate organizations, one to handle contracts performed under union conditions and the other under nonunion conditions.
 
 
 28
 The Board noted that it has refused to include the employees of a nonunion company in the same bargaining unit with those of a union company controlled by the same interests, citing Central New Mexico Chapter, National Electrical Contractors Association, 152 N.L.R.B. 1604 (1965). There the petitioner, a local of the International Brotherhood of Electrical Workers, contended that Gamblin Electric Co. and New Mexico Electric Construction Co. ("NMECO") constituted a single employer for unit purposes. Gamblin (union) was engaged in commercial and industrial electrical contracting work; NMECO (nonunion) in residential contracting work. The Board said there was ample evidence in the record to support the conclusion that the two corporations constituted a single employer under the Act. However, it held that NMECO did not have to be included in a multi-employer unit composed of members of the Chapter (including Gamblin) which had signed a letter of assent to the Chapter's representation in bargaining activities, saying:
 
 
 29
 In the circumstances of the case, and particularly in view of the separate supervision of employees of the two firms, their separate location, the lack of employee interchange, absence of evidence of functional integration, and the fact that labor policies of NMECO, a residential contractor, are based on its own needs and are not dependent on those of Gamblin, a commercial and industrial contractor, show that employees of the two firms do not have the same community of interest.
 
 
 30
 Thus, although the Board found sufficient evidence to support a holding of "single employer" status, it declined to place the employees of a commercial and industrial contracting firm in the same unit with the employees of a residential contracting firm, because the employees of the two firms did not have the same "community of interest." Here Kiewit and South Prairie are engaged in the same class of construction work in the same locality; and the Board gave no indication that, if a "single employer" status obtained, it would have disagreed with the ALJ's conclusion that Kiewit and South Prairie employees constitute an appropriate unit for collective bargaining purposes.
 
 
 31
 The Board also noted that it has refused to require a nonunion company to recognize the bargaining representative of a union company's employees or to apply the collective bargaining contract with the latter to the former. It cited Gerace Construction, Inc., 193 N.L.R.B. 645 (1971), in which it reversed the trial examiner's determination that Gerace (union) and Helger Construction Co. (nonunion), which had common stockholders and directors, functioned as a single enterprise and constituted a "single employer." Both companies submitted separate job bids and normally did not bid on the same jobs; also, there was no showing that Gerace lost business to Helger or that any Gerace employee lost work he otherwise would have had. However, the Board found that Helger's contracts amounted to less than $50,000, while Gerace's were seldom less than $250,000; further, that the principal stockholder in Gerace was no longer a stockholder and director in Helger, having sold his stock to one Sweebe, the principal management officer of Helger, and that actual control of Helger was in Sweebe. The Board also cited Frank N. Smith Associates, Inc., 194 N.L.R.B. 212 (1971). That case involved two corporations, Smith Associates (union), which was engaged in construction and repair of commercial and industrial buildings, and Kuka (nonunion), which was engaged in construction of commercial, industrial, and residential buildings. The record showed that Smith Associates did not own and/or control Kuka, and Kuka was not part of Smith Associates as a wholly or partially owned subsidiary. The trial examiner, whose decision was affirmed and adopted by the Board, concluded that Kuka operated "in an area of business not available to Associates" and determined that there would be an inappropriate unit if Kuka's employees were considered to be Associates' employees. It is evident that the facts in these cases differ critically from the facts of the case before us. In Gerace, the Board found that actual control of the nonunion company was in its principal management officer. In Smith, there was no wholly or partially owned subsidiary, and one company operated in an area of business not available to the other.
 
 
 32
 Respondents argue that there is no evidence that Kiewit's employees actually lost work because of South Prairie's entrance into Oklahoma and that, accordingly, "there is no basis here to support the conclusion that South Prairie's presence in Oklahoma was detrimental to Kiewit's business or to the earnings of Kiewit's Union employees"; further, that petitioner union is "attempting to seize upon common corporate ownership to achieve initial representation without engaging in an organization campaign." Although we recognize that the central purpose of the "single employer" principle is to make collective bargaining agreements legally binding, we do not agree that it is necessary for petitioner to have waited for hardship to occur to show that Kiewit's employees actually lost work or that there were other detrimental effects in order for the "single employer" principle to apply.[15] What is necessary is a showing of a reasonable likelihood of such occurrences. See Local 1912, International Association of Machinists v. United States Potash Co., 270 F.2d 496, 498 (10th Cir. 1959), cert. denied, 363 U.S. 845, 80 S.Ct. 1609, 4 L.Ed.2d 1728 (1960).
 
 
 33
 Commencing the day after South Prairie filed to do business in Oklahoma on November 23, 1971, and running to July 23, 1972, Kiewit submitted no bids for Oklahoma State Highway Department jobs; whereas between February 25 and June 23, 1972, South Prairie bid on four. South Prairie's bidding on the four Turnpike Authority jobs precluded Kiewit from doing so, and Kiewit's late filing of its 1971 financial report precluded it from bidding on the fifth Turnpike Authority job. Although Kiewit bid (unsuccessfully) on three Highway Department jobs between July 23 and October 1972 (after petitioner union filed the charge on June 20, 1972), South Prairie obtained "one of the largest in Highway Department history." Meanwhile, the four jobs Kiewit had obtained between January 1 and November 23, 1971, were in the course of completion. When South Prairie began doing business in Oklahoma, there were transfers of key personnel from Kiewit to South Prairie, and, as time went on, supervisors were transferred from Kiewit to South Prairie to such an extent that a majority of the latter's supervisory staff consisted of such transferees. In view of such developments, we conclude that a reasonable likelihood that Kiewit's business would decline and that Kiewit's employees would lose work has been established, so that application of the "single employer" principle would serve to protect the Union's agreement with Kiewit and to prevent Kiewit's employees from losing "the fruits of the contract." Local 1912, International Association of Machinists v. United States Potash Co., supra at 498.[16]
 
 
 34
 Accordingly, we hold that the Board erred in finding that Kiewit and South Prairie had no obligation to recognize Local 627 as the bargaining representative of South Prairie's employees or to extend the terms of the Union's agreement with Kiewit to South Prairie's employees.
 
 
 35
 The order of the Board is vacated and the case is remanded for issuance and enforcement of an appropriate order against respondents Kiewit and South Prairie.
 
 TAMM, Circuit Judge (dissenting):
 
 36
 I must dissent from this needless vacation of the Board's order, which has resulted from a factual disagreement between a majority of this division and the expert agency charged with principal responsibility for administering our labor policy.
 
 
 37
 There is no dispute in this case regarding the applicable legal standard. To determine whether two nominally separate employers are, in reality, a "single employer" for purposes of the Act, (1) the interrelationship of operations, (2) centralized control of labor relations, (3) common management and (4) common ownership must all be considered. Radio Union v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965). Consequently, the controversy is simply over the application of those indicia of control to this factual context.
 
 
 38
 Thus viewed, it becomes apparent that the majority simply has substituted its view of the facts for that of the agency to whom Congress has assigned the task of developing expertise over this type of factual affair. Several references to the majority opinion will suffice to demonstrate this phenomenum.
 
 
 39
 For example, while discussing the factors the Board found significant, the majority delves into the record itself and delineates the facts it finds significant to reach the opposite conclusion. See 171 U.S.App.D.C. p. ---, 518 F.2d p. 1046. The majority attempts to paint a picture of a substantial shifting of personnel between the companies, despite the fact that even the Administrative Law Judge found "little evidence of transfers of such (i. e. rank & file) employees between (Kiewit's) and South Prairie's payroll." Ante, 171 U.S.App.D.C. p. ---, 518 F.2d p. 1047. Finally, the majority claims that South Prairie's bidding on four Turnpike Authority jobs between February and June 1972 precluded Kiewit from doing so; in fact, Kiewit was working near full capacity during this period. This is not a case where a new non-union company is "spun off" to draw away the union company's business; before entering Oklahoma, South Prairie had been in existence for twenty-eight years as a non-union company.
 
 
 40
 Were we deciding this case de novo, I might agree with the majority. However, finding the Board's order supported by substantial evidence, I respectfully dissent.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a)
 
 
 [1]
 "(a) It shall be an unfair labor practice for an employer
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 (5) to refuse to bargain collectively with the representatives of his employees subject to the provisions of section 159(a) of this title."
 
 
 [2]
 Darveau testified that "our competitors were several cents or quite a little bit below us on the salaries they were paying, 50 cents or a dollar an hour than what we were paying." The ALJ found that employees on South Prairie's payroll are paid 50 cents to a dollar an hour less than those on Kiewit's payroll and do not receive the health and welfare benefits enjoyed by the latter
 
 
 [3]
 Under the circumstances of this case, we do not consider it material whether Kiewit, Inc., made the decision or whether Kiewit did so. The ALJ noted that Darveau had said he made the decision. Gerald Ellis, the Union's business agent, testified that Kiewit's attorney, Robert Doyle, told him that Kiewit was a "controlling company of South Prairie." (Doyle was present at the hearing before the ALJ, but did not testify.) Richard D. Coyne, vice president of Kiewit and a director of Kiewit, Inc., testified that Kiewit, Inc.'s board of directors made the decision because "if we were going to stay in business in the State it probably would have to be with a company that wasn't burdened by the union agreement." (Emphasis supplied.) The ALJ credited Coyne's testimony that South Prairie's board of directors sets South Prairie's labor policies and "they of course would get their instructions from Peter Kiewit Sons', Inc."
 
 
 [4]
 The ALJ credited Ellis' testimony that during negotiations on the 1970-73 agreement Darveau told Local 627 that, if it did not get more contractors signed to the collective bargaining agreement, Kiewit was going to quit bidding work in Oklahoma and leave the state. However, Coyne testified that, when initially deciding to bring in South Prairie, Kiewit, Inc.'s board of directors "specifically decided that Kiewit would stay (in Oklahoma) and try to compete in some of the types of work in some of the areas where possibly they could be competitive." The ALJ concluded that the record failed preponderantly to show that, when it was initially decided to bring in South Prairie, it was intended that Kiewit cease doing business in Oklahoma
 
 
 [5]
 The "steel inserter" was later used by Kiewit on "the Warner job," and after he left the South Prairie yard, Bolding went to work on Kiewit's Warner job
 
 
 [6]
 The ALJ noted that of thirteen rival bidders, only one obtained contracts totaling more (by about twenty percent) than those obtained by Kiewit; that those obtained by Kiewit totaled about forty percent more than the third-ranking bidder; and that three of the four Kiewit contracts were among the five largest jobs for which Kiewit had bid. Such an achievement by Kiewit, the only highway contractor in Oklahoma to have a signed agreement with a union, indicates that the Board erred in stating that Kiewit was "not sufficiently competitive with nonunion contractors."
 
 
 [7]
 Between May and July 5, 1972, Kiewit was not qualified to bid for State Highway or Turnpike Authority work because of late filing of its 1971 financial report. Moreover, because all of the stock of Kiewit and South Prairie is owned by a single entity, under Oklahoma law South Prairie's bidding on the Highway Department and Turnpike Authority jobs precluded Kiewit from bidding on the same jobs
 
 
 [8]
 In a later decision, NLRB v. Welcome-American Fertilizer Co., 443 F.2d 19, 21 (9th Cir. 1971), the Ninth Circuit, citing Sakrete, said that no one of the four criteria is controlling
 
 
 [9]
 The "arm's length" test makes meaningful the Board's reference in Canton, Carp's, Inc., supra at 484, to "realities of commercial organization." It was applied by this court in American Fed. of Television & Radio Artists v. NLRB, 149 U.S.App.D.C. 272, 462 F.2d 887 (1972)
 
 
 [10]
 Petitioner relies heavily on NLRB v. Royal Oak Tool & Mach. Co., 320 F.2d 77 (6th Cir. 1963) in which the court said, at 81:
 It requires a greater degree of credulity than is possessed by this Court to accept the view that (the subsidiary's operating officers) could inaugurate or establish a labor policy . . . that did not meet with the absolute approval of the board of directors (of the parent company).
 So too, we are persuaded that South Prairie's president, having decided or, at least, recommended that South Prairie be activated in Oklahoma, was not a free agent to alter South Prairie's nonunion policy.
 
 
 [11]
 With the Wagner Act (Pub.L.No.158, 49 Stat. 449), Congress in 1935 declared the national labor policy to be the encouragement of collective bargaining and removed legal obstacles to organization to clear the way for effective union security devices. In 1959, the Labor-Management Reporting and Disclosure Act (Pub.L.No.86-257, 73 Stat. 519, 545) added section 8(f) to the NLRA to exempt the construction industry from some of the requirements obtaining in other industries for example, a union need not be the certified representative of a majority of the employees. C. Morris, The Developing Labor Law 609 (BNA 1971). While an employer is legally entitled to avoid bargaining with a union if it has not been chosen by the employees, exercise of control over labor relations by deciding that South Prairie would follow a nonunion policy cannot be reasonably regarded as other than a substantial qualitative degree of control
 
 
 [12]
 In its brief, the Board fully recognizes the criteria specified by the Supreme Court in Radio Union, supra
 
 
 [13]
 As noted by the ALJ, rank-and-file employees are hired for a particular job only, so "(t)here is little evidence of transfers of such employees between Peter Kiewit's and South Prairie's payroll." See Local 150, Int'l Union of Op. Eng. v. NLRB, 156 U.S.App.D.C. 294, 297, 480 F.2d 1186, 1189 (1973)
 
 
 [14]
 What this court said in Greater Boston Television Corp. v. F. C. C., 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851, cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1951), is worth repeating here:
 The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues. This calls for insistence that the agency articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts . . . .
 (Footnote omitted and emphasis supplied.)
 
 
 [15]
 "For in the labor field, as in few others, time is crucially important in obtaining relief." NLRB v. C & C Plywood Corp., 385 U.S. 421, 430, 87 S.Ct. 559, 565, 17 L.Ed.2d 486 (1967)
 
 
 [16]
 Respondent South Prairie cites B & B Industries, 162 N.L.R.B. 832 (1967), where the Board found no violation in the refusal to apply an agreement signed by one company to another company, the two being jointly owned. At the time the contract was signed, the second company was engaged in the same class of work in the same locality as the signatory company and shared the same office space, clerical personnel, and post office box; also a number of employees had worked for both companies at different times. The Board found that the General Counsel had not proved by a preponderance of the evidence that the agreement was intended to cover the non-signatory company. Such facts readily distinguish that case from the one before us, where it clearly was not contemplated by the parties at the time the involved agreement was negotiated that South Prairie would be brought into Oklahoma under circumstances that would be likely to jeopardize the rights of Kiewit's employees to receive "the fruits of the contract."